## MICHAEL DEMPSEY vs. JOHN G. SAWYER.

Penobscot.    Announced March 26, 1901.    Opinion May 29, 1901.

*Negligence.   Defective Machinery.   Assuming Risk.   Master and Servant.*

1.  The risk of injury to a servant from defective machinery is primarily upon the master, and remains upon him unless the servant voluntarily assumes it.

2.  The servant may voluntarily assume such risk and relieve the master from it, but such assumption is his voluntary act, not his legal duty.

3.  Whether the servant has voluntarily assumed such risk is a question of fact to be determined by the jury.

4.  When, however, the servant knows and appreciates the danger of injury from defective machinery and yet enters or continues in the dangerous service without protest, the necessary inference is that he has voluntarily assumed the risk.

5.  Although the servant may have once taken such risk upon himself, he may throw it back upon the master by a notification that he will no longer carry it. Whether the risk once assumed has been thus thrown off is a question of fact for the jury.

6.  When a servant has thrown off the risk once assumed he may voluntarily re-assume it, and whether he has re-assumed it is also a question of fact for the jury.

7.  When a servant has notified the master that he will no longer carry a risk once assumed, and is requested by the master to continue in the service, with the assurance that the defects shall be speedily remedied, and the servant thereupon does continue in the service, it is a question of fact for the jury whether the servant has thereby re-assumed the risk, pending the removal of the defects, or whether it remains upon the master.   There is no necessary inference either way.

8.  In this case, the jury has found for the plaintiff upon all these questions of fact, and the court is not convinced that the jury was unmistakably wrong in so doing.

On motion by defendant.    Motion overruled.

Case for personal injuries.    Verdict for plaintiff for $950.

The facts appear in the opinion.

*W. H. Powell and L. C. Stearns*, for plaintiff.

*C. A. Bailey*, for defendant.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, SAVAGE, FOGLER, POWERS, JJ.

EMERY, J. After studying the evidence, with the valuable aid of the full analysis made by the counsel, our conclusion is that we cannot hold the jury to have been unmistakably wrong in believing, and basing their verdict upon, the plaintiff's version of the events, and in drawing inferences therefrom favorable to the plaintiff. The counsel for the defendant has argued strenuously upon the facts and inferences, but the verdict of the jury outweighs even his weighty argument. The version thus sustained is substantially as follows: The plaintiff was thirty years old, and was accustomed to the work of running mill saws of various kinds including lath saws. He was in the employ of the defendant as a workman in his mill, and was running there a circular-saw machine like a lath machine and with it sawing birch-bolts into spool-wood bars. There were several saws pertaining to this machine, and as the one in use became worn, it would be taken out to be filed or re-cut, and another and freshly filed or re-cut saw would be substituted. This filing or re-cutting of the saws was done by the defendant, and the plaintiff had nothing to do with it.

Some of these saws were so filed or cut that the teeth were too long and slim to endure the contact with the hard wood without danger of breaking and flying out, or of bending in the wood and throwing out splinters. This was found by the jury to be a defect in the saws, fraught with danger of personal injury to the workman running it carefully, and a defect known to the defendant. The plaintiff, however, before he was injured, also knew of the defect and fully appreciated its nature and the danger of personal injury from it.

After he had been working at this machine for seventeen days, and while running it in the course of his employment with due care upon his own part, a saw tooth was broken off and thrown out into his face to his injury, or a splinter was thrown out by a bent tooth with the same result. This event was the direct result of the above described defective method of filing or cutting the

saws for that kind of work. The plaintiff knew that this partic-
ular saw was defective as stated, and knew that the injury suffered
was to be apprehended from that defect, however carefully he
might work.

If the above were all the material facts, there would be only one
defense to this action, as all the other necessary elements of a right
of action are established by the verdict, viz:—the defendant's
negligence or breach of duty, the resulting injury to the plaintiff,
and the absence of any contributory negligence upon his part.
That one defense is this, viz: that the plaintiff had assumed the
risk of the injury as his own, risk. The danger of such an injury
was a danger directly attendant upon even the careful use of a
saw with such teeth in such work. The plaintiff knew of the
defect, and appreciated the attendant danger.

Other facts, however, do appear in the plaintiff's version, which
the jury have found to be true, viz: After seeing the defect in
the saws and the consequent danger, but before the injury, the
plaintiff told the defendant that the teeth of the saw he was then
using were too slim to stand the hard wood. The defendant shut
down the machine and substituted another saw. This and the other
saws after awhile showed the same defect. Finally, on the morn-
ing of the injury, the plaintiff noticed that three teeth were gone
from the saw then in the machine. He started the saw and went
to work with it, and in a few minutes a tooth bent over and tore
through the wood. He then went to the defendant and had with
him the following conversation: "I told Mr. Sawyer I was not
going to work any longer with teeth bent in the saw, unless he
would go up and fix it. He wanted to know what the matter was.
I told him there was a tooth bent over in the saw. I told him I
would not work unless he would go up and fix it. He said he
would go up and fix it sometime in the forenoon, and for me to go
back and go to work and work it as easy as I could." The plain-
tiff thereupon went back to his work, and while running the saw as
easily and carefully as he could, was injured from a tooth breaking
or bending as above described.

Did these additional facts authorize the jury to find that, at the

time of the injury the plaintiff had thrown off the risk, he had at first assumed?

There is an essential difference between the defense of contributory negligence and the defense of assumption of risk, a difference often obscured, but which should be kept clear in the mind, for a correct understanding of the relative rights and duties of master and servant, as to the dangers arising from the use of defective machinery or appliances. Contributory negligence is a breach of the legal duty of due care imposed by law upon the servant however unwilling or protesting he may be. Assumption of risk is not a duty, but is purely voluntary upon the part of the servant. The risk from the master's breach of duty never rests upon the protesting or even unwilling servant. Volens, not sciens, is the test. *Mundle* v. *Hill Manfg. Co.*, 86 Maine, 400 ; *Conley* v. *Am. Ex. Co.*, 87 Maine, 352 ; *Jones* v. *Manufg. & Invst. Co.*, 92 Maine, 565 at page 569. The risk of injury to a servant from known defects in machinery, or appliances, is primarily upon the master, imposed upon him by law even against his protest, as the legal consequence of his breach of his legal duty to at once remedy such known defects. The risk attends the duty. The servant, however, may, if he will, agree to bear such risk himself and thus relieve the master from that risk, but until he does in fact so agree, the risk remains upon him who has the duty. Also, when the servant effectually throws off the risk he had once voluntarily assumed, it falls back where the law first placed it, *i. e.*, upon the master.

There is rarely any such stipulation expressed in any contract of employment, but it is usually implied like many other stipulations. Nothing appearing to the contrary, in such a contract the servant is understood to agree to take upon himself the risk of injury from dangers visible and appreciated, even when impending from known and understood defects in the machinery, or appliances, furnished by the master. If such defects and dangers first appear after the servant has entered upon his work, and he makes no complaint nor request to have the defects remedied, he is still understood to accept the risk of them. Indeed, under such circumstances, the presumption that he has assumed the risk is practically conclusive. Never-

theless, it is competent for the parties in their contract of employment to negative such an understanding, and have it expressed or understood that the risk shall remain, with the duty, upon the master. It is, also, competent for them afterward to cancel such an agreement, actual or presumed, once made, and thereby let the risk fall back upon the master. Indeed, the servant can himself terminate such an implied presumed, or even expressed, agreement by giving notice to the master that he will no longer bear the risk. The law does not require the servant to bear such a risk, *i. e.*, a risk from defects, a moment longer than he is willing to, whatever may have been his original contract. When the servant does terminate his agreement to bear the risk, it at once reverts "nolens volens" upon the master whose breach of legal duty occasions the risk. Of course, however, after the servant has once thus terminated his agreement to bear the risk, he may renew it, and such renewal may be implied from circumstances as well as expressed in words. If renewed, the risk is again assumed by the servant until he again terminates the agreement of assumption.

Whether and when such an agreement once made, either by express words or by implication, is cancelled or terminated, is a question of fact for the jury. Such cancellation or termination, like the agreement itself, may be inferred from circumstances as well as established by express words. If it appear from any competent evidence that the agreement was cancelled or terminated, then the risk for the future by operation of law falls back, where the law primarily placed it, upon the master; and there it remains until there is shown a new agreement, or a renewal of the original agreement, by the servant to assume the risk. Whether and when such a renewal or new agreement is made, is also a question of fact for the jury.

Recurring now to the facts of this case: the plaintiff, in substance, distinctly notified the defendant of the dangerous defects in the saw, and that he would not continue working with it in that defective condition. Surely, the jury could properly find from this, as they did, that the plaintiff's original agreement to assume the risk of injury from that defect was then effectually terminated, and

that the defendant must have so understood.  The risk was then upon the defendant, imposed upon him by law.  It was then his duty to guard against that danger.  He was in control of the situation.  He could remove the defect, or stop the work.  He did neither.  He preferred to have the work go on with the perilous defect still existing.  The future risk from that defect was plainly upon him, unless, indeed, the plaintiff agreed anew to assume it. Whether the plaintiff did so agree anew, is a question of fact, and is the final and perhaps pivotal question in this case.

Upon this question the facts found are these:  After the termination of the plaintiff's original agreement to assume the risk, the defendant promised to remove the defect from the saw later that forenoon, presumably at a time more convenient for him, but directed the plaintiff to return at once to the saw and to run it in the meantime as easily and carefully as he could in its defective condition. The plaintiff making no reply, or other protest, at once went back to work with the saw as directed, and was soon injured thereby as above stated.

When more than one inference of fact is reasonably deducible from proven facts, the question which is the correct or more reasonable inference is for the jury.  Whether or not these facts show an agreement by the plaintiff to re-assume the risk, which he had just before thrown back on the defendant, was primarily a question for the jury which they have answered in the negative.  We cannot render a contrary judgment merely because the facts seem to us to show such an agreement.  The question for us is, whether such an agreement is so evident that no other conclusion is reasonable, bearing in mind all the time that twelve men of affairs have held the contrary.

There are published cases in which it has been properly held that, under the circumstances of the particular case, the return to work by the servant after he had notified the master of the defects and danger was conclusive evidence that he re-assumed the risk. There are other published cases in which it has been held, as matter of law, that under the circumstances of the particular case, the servant though going back to work after such notification did not

re-assume the risk. The reasoning of all those cases must be confined to the facts of each case, and cannot control us here. In this case we think there are some facts which preclude us from holding either way as a conclusive presumption or matter of law.

The risk was not one attendant upon the general nature of the master's business, or the servant's employment. It arose solely from a dangerous defect in the machinery known to the master, and which it was his duty to instantly remedy. The servant had no special department in which he was to exercise his own judgment. The nature of the business and of his employment was such that he was, in a measure, subject to the master's varying directions in the varying exigencies of the business. As such servant his natural impulse was to obey such directions. He had done his duty in notifying the master of the defects in the machinery, and of his unwillingness to bear the risk from them. The master made no suggestion of increased compensation for such risk, nor of any other inducement for the servant to re-assume the risk. There was no parleying whatever. He promised to soon remedy the defects, but practically told the servant to go back to work at the defective saw until he should have time to do so. This might seem to men of affairs to savor as much of an order to be obeyed without question, as of a proposal to be considered, or as of an inquiry as to his willingness. The servant did not question the order, but at once did as he was bid.

Again, it might seem to men of affairs that under all the circumstances such a direction by the master, accompanied by an express assurance that the defect would soon be remedied, contained an implied assurance to the servant that in the meantime he would be working at the master's risk,—or at least that the servant assumed, and was justified in assuming, that pending the promised repairs, the master carried the risk of the want of repair. The defect was brought to the master's notice. The risk was thrown back upon him. He acknowledged the defect and the risk. For his own profit, he directed the work to go on until he could more conveniently repair. Might not the servant reasonably understand from this that the master chose to bear the risk for a time, rather than

stop the work at once ?   At least might not a jury reasonably so find ?

Under these, and all the other circumstances of the case, it does not seem to us beyond question that the servant's return to the saw and the peril were in pursuance of an agreement, or even willingness to re-assume the risk, rather than in unwilling, or at least unreflecting, obedience to an order to return, or with an understanding by him 'that the risk was on the master.   With what mind he returned was a question for the jury, and, whatever our own views, our judgment must follow their verdict.

Since every case of this nature must be determined upon its own peculiar facts, we have abstained from quoting from decided cases. The legal propositions stated are supported by numerous judicial opinions.   Among these may be cited, *Yarmouth* v. *France*, 192 Q. B. D. 647 ; *Smith* v. *Baker*, 1891 App. Cas. 325 ; *Hough* v. *Tex. & Pac. Railway Co.*, 100 U. S. 213 ; *Fitzgerald* v. *Conn. Riv. Paper Co.*, 155 Mass. 155 ; *Mahoney* v. *Dore*, 155 Mass. 513 ; *Narramore* v. *C. C. & St. L. Ry. Co.*, 96 Fed. Rep. 298 ; *Roux* v. *Lumber Co.*, 85 Mich. 519 ; *McFarlan Co.* v. *Potter*, 51 N. E. Rep. 737 (Indiana.)   These last three cases cited contain many quotations from numerous other opinions.   The reader is also referred to exhaustive notes in 40 L. R. A. 781, 47 L. R. A. 161, and in 49 L. R. A. 33.

It should be borne in mind that our reasoning and statements in this opinion are limited to the specific facts of this case.   A different verdict might have required a different judgment.   Even a small variation in the material facts might require different reasoning or a different conclusion.

Our decision is merely (1) that the disputed questions in this case were for the jury, and (2) that upon these questions their findings are not unmistakably wrong.

*Motion overruled.   Judgment on the verdict.*