# Wytheville.

## CHESAPEAKE AND OHIO RAILWAY COMPANY v. MEADOWS.

June 8, 1916.

Absent, Keith, P.

1. EVIDENCE—*Admissibility—Relevancy—Case at Bar.*—It being material to show that the stoker engines on locomotives of a given class would continue to run after the throttle valve was shut off, and the defendant having offered evidence to show that they would not, it was entirely competent for the plaintiff to show that they would, and that the witnesses knew that fact from actual experience in the use of such engines.

2. TRIAL—*Interrogatories to Jury—Federal Employers Liability Act—State Practice.*—It is not error for the trial court to refuse to propound interrogatories to the jury and to direct them to set out in their verdict all the facts they regard as proved under each interrogatory. Such verdicts are unknown to our practice, and there is nothing in the Federal employers liability act which requires it. When Congress gave the State courts co-ordinate jurisdiction with the Federal courts in this class of cases, it, by necessary implication, adopted the procedure and practice of the State courts for the trial of such cases.

3. GENERAL VERDICTS—*Instructions—Presumption—Special Findings.*— When the jury have been fully, fairly and accurately instructed on the law of the case, and have found a verdict, the court will presume that they gave proper consideration to the instructions of the court, unless the verdict is plainly contrary to the law and the evidence. It is not necessary that they should make a special finding of the facts to enable the court to ascertain if they had obeyed its instructions. Where a general verdict will respond to all the issues of fact submitted to the jury, there is no good reason for requiring a special verdict stating the ultimate facts ascertained, and the application of the law thereto as made by the jury.

4. FEDERAL EMPLOYERS LIABILITY ACT—*Negligence—Contributory.*—The question, both as to the existence and the non-existence of contributory negligence, as well as its proportional relation to the combined negligence of the plaintiff and the defendant, is, by the Federal em-

3·

ployers liability act, made a question solely for the jury, and the courts refuse to direct or set aside verdicts regardless of the showing as to contributory negligence.

5. DAMAGES—*Personal Injury—Partial Disability—Instructions.*—In a personal injury action, an instruction which tells the jury that they may award the plaintiff such sum as will be "proper compensation for his being unable, because of his injury, to follow such a calling or business as he could otherwise have followed" is unobjectionable, although the plaintiff was not entirely disabled or unable to follow some calling from which earnings would arise, other than that in which he received his injury.

6. MASTER AND SERVANT—*Assumption of Risk—Unusual Conditions—Notice.*—A servant cannot be held to have assumed the risk of a dangerous or unusual condition, brought about by the negligence of the master, or his employers, of which he was ignorant and could not have known by the exercise of ordinary care.

7. MASTER AND SERVANT—*Assumption of Risk—Question for Jury—Case at Bar.*—If it be conceded that the evidence in the case at bar tended to show that the plaintiff assumed the risk resulting in his injury, whether or not he did so assume it was a question for the jury, and it was not proper for the court, under the evidence, to so rule as a matter of law.

8. MASTER AND SERVANT—*Federal Act—Contributory Negligence—Assumption of Risk.*—In an action arising under the Federal employers liability act, it is necessary to distinguish between assumption of risk and contributory negligence, as the former is a complete defense to the action, while the latter only goes in mitigation of damages.

9. MASTER AND SERVANT—*Contributory Negligence—Assumption of Risk.*—Contributory negligence is a breach of duty imposed by law upon the servant, however unwilling and protesting he may be, while assumption of risk is not a duty, but a matter of contract and is purely voluntary on the part of the servant.

10. MASTER AND SERVANT—*Risks Assumed by Servant.*—The servant assumes all the ordinary, usual and normal risks of the business after the master has used reasonable care for his protection, and also all such other risks as he knows of, or which were so unquestionably plain and clear that he must have known of their existence and their danger to him.


Error to a judgment of the Circuit Court of the city of Clifton Forge, in an action of trespass on the case. Judgment for the plaintiff.   Defendant assigns error.

*Affirmed.*

The opinion states the case.

*J. M. Perry*, for the plaintiff in error.

*O. B. Harvey*, for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action was brought by the plaintiff, J. W. Meadows, under the Federal employers' liability act, to recover damages for personal injury alleged to have been sustained by him because of the negligence of the defendant, The Chesapeake and Ohio Railway Company.

The defenses interposed to the action were, *first*, that the defendant was not negligent in any respect as charged in the declaration; *second*, that the plaintiff was guilty of negligence which contributed to his injury; and, *third*, that the plaintiff assumed the risk of the injury complained of by him in each of the counts of his declaration.

At the trial of the cause there was a verdict for the plaintiff, which the trial court refused to set aside and entered judgment thereon, to which judgment this writ of error was awarded the defendant.

The plaintiff was a locomotive fireman of ten years' experience employed by the defendant in interstate commerce, and about an hour before sunrise, on September 23, 1914, the day of the accident to him, was a fireman on a very large locomotive, known as a "Mallet," of peculiar and unusual construction, drawing an eastbound interstate train of freight cars from Hinton, West Virginia, which train, upon arriving at the Clifton Forge (Va.) yards, was moving slowly along a "lead" track towards the yard track which would

be its terminal. The Clifton Forge yards consist of an east yard and a west yard, the west yard being the terminal for all eastbound freight trains and the east yard for all westbound trains. Plaintiff's train was approaching the west end of the west yard, where the defendant has a signal tower known as "A. N. cabin," in which is an operator and signalman. Switches connecting the main line with the yards are operated from this tower by the operator and signalman, and there is also operated from this tower a fixed semaphore signal with moving paddles, known among railway men as a "block" or "block signal," which signal is located west of the tower at the western limits of the west yard. Under the rules of the defendant, no train can enter the yard until the operator or signalman in the tower has caused the semaphore to show a "white block," and has thrown the "cross-over" switch from the main line to the yard "lead" track. The yard is connected by telephone with the tower from what is known as a "switch box," being a small house located in the midst of the yard, and no train is allowed by the signalman in the tower to come into the yard until the yard employees have ascertained that the tracks over which the incoming train must pass has been cleared of all obstructions and are safe for the train crew in the performance of their duties, and these facts telephoned to the signalman in the tower; whereupon, the signalman in the tower throws the "cross-over" switch and pulls the lever in the tower which gives the "white block" on the semaphore signal, the "white block" meaning, under the rules of the defendant company and by its daily practice, that the yard employees had been over the entire track over which the incoming train must pass to its stopping point, which, in this instance, was the east end

of the west yard, and that the track was safe and clear.

When the plaintiff's engine first came in sight of the signal controlling its further movements, the "block" was closed, which meant that the engine must stop when it reached the signal post. Before the engine arrived at the signal post, however, "the block came white," and, therefore, the train did not stop at all but passed the tower, went over the "cross-over" switch from the main line on to the "lead" track of the yard, and under the rules, regulations and practice of the defendant company neither the engineer nor the fireman on a train entering the yard knew or could know on which of the numerous tracks in the yard they were to go from the "lead" track, but this was entirely under the control of the yard employees. On the fireman's side of the engine and from the left-hand side of the "lead" track various yard tracks, parallel to one another, diverge at a slight angle. On one of these yard tracks, on the occasion of the accident to plaintiff, stood a freight train of some sixty odd cars, made up to go east, with caboose attached, and at each upper rear corner of the caboose and projecting beyond its side and rear hung a lighted "marker" or signal lamp, showing a green light to each side and a red light to the rear to indicate the rear of the train. The caboose was quite close to the intersection of the yard and "lead" track, and as plaintiff's engine passed it, and just before it came opposite to the fireman's seat in the cab, plaintiff put his head out of the cab window and was struck and injured by the "marker" which had been torn loose from its fastening and the light in it put out by a collision with the front of the cab of the engine. Plaintiff's

injury was painful, keeping him in bed some days, and
resulted in deafness in the right ear and headaches.

The plaintiff struck out the second count of his
declaration before the jury was sworn, and the case
proceeded on the first count alone, which alleged negli-
gence on the part of the defendant in permitting its
caboose to stand too near the "lead" track over which
the plaintiff's engine had to move and was moving at
the time he received the injury of which he com-
plains.

The first assignment of error is to the ruling of the
court admitting in evidence testimony given by plain-
tiff's witnesses, Hutchinson and Taylor, with respect to
the construction and condition of engine 701, upon
which plaintiff was at work when injured, the engine
being of the "Mallet" type, of which the defendant
had fourteen in use at that time and prior thereto.

The rules of the defendant, which were in evidence,
show that it was the duty of a fireman on the main
line, in coming into the Clifton Forge yards, "as far
as practicable, when running, to keep a lookout ahead
for signals and obstructions," and it appeared that on
engine 701, which the plaintiff was firing, this duty
could only be performed by projecting his head out
of the side window of his cab, because of the construc-
tion of the engine. It also appeared in evidence that
this rule of the defendant, as construed and acted upon
by its firemen, meant that the firemen should keep a
lookout, etc., when not engaged in other work, such
as firing the engine or doing something that is his duty
on the engine—that is, the primary duty of a fireman
is not to look out, but to fire the engine. It further
appears that on plaintiff's engine there was, as on all
engines of the same type, a mechanical stoker, con-
sisting of a stoker engine run by steam and certain
pipes and screws running from the engine of the loco-

motive back to the coal in the tender, and certain
feeds and mechanical devices moved by the stoker
engine, whereby the coal was brought from the tender
into the firebox of the locomotive.   The stoker engine
was built into and attached to the head of the boiler
of the locomotive and was propelled by steam drawn
from the boiler.   This was a labor-saving device, by
means of which the large quantities of coal required
by this mammoth locomotive might be fed to its fires
by mechanical means;  and there was evidence proving
or tending to prove that the fireman's primary and
principal duty was to look after this mechanical
stoker, to shut off and stop the running of the stoker
and stoker engine when coming into terminals.   The
plaintiff, it appears, threw out the clutch of the stoker
engine just before arriving at the yard limits, which
stopped the feeding of coal to the locomotive, but that
left the stoker engine running.   He then looked out to
see the semaphore signal, being required by the rule
of the defendant to repeat to the engineer the signal
as he saw it, and the engineer to him.   He saw the
"white block" and continued to look out for a short
distance as he passed into the yard, and then stopped
looking and attempted to stop the stoker engine.   The
throttle valve controlling its running was defective
and did not completely shut off the steam, and when
closed as far as he could close it, the engine continued
to turn over slowly;  whereupon, plaintiff took a broom
handle which was on the locomotive and made a brake
of it by pressing it against the solid fly wheel, which
took but a moment or two, and then he got back on
his seat by the cab window and projected his head a
short distance therefrom in order to perform his duty
of looking out, and was immediately struck and in-
jured as above stated.   These facts were testified to

by the plaintiff, and the testimony given by his witness, Hutchinson, objected to by the defendant, is as follows:

"Q. You have heard what Mr. Meadows says about stopping his stoker engine; I wish you would state whether that has been done by you? A. That is about the only way you can get them stopped." And the witness further said that the way plaintiff had said he stopped his stoker engine "is a common practice among firemen on Mallet type engines."

The testimony given by plaintiff's witness, Taylor, over the objection of the defendant, is as follows:

"Q. We are discussing here the question about the stoker engine running after the steam is cut off? A. Yes, sir, they do it.

"Q. Do they do that? A. Yes, sir." And the witness was further permitted to state that a few days before the trial he had gone to a similar engine on the yard and when he got on the engine the stoker engine was running; that he found the throttle was closed and the cylinder cock open, and that he took a piece of waste in his hand and held it against the fly wheel in order to stop it.

The record discloses that one of the principal defenses and contentions of the defendant throughout the trial of the case was that what plaintiff said about the construction and mechanical action of the stoker engine and the necessity for his work with it, and particularly what he said about the running of the engine after the valve had been turned down as far as it would go, was untrue, and that plaintiff was needlessly giving attention to the stoker engine at a time when, if he had been doing his duty, he would have been looking out, and would have avoided the consequences of the negligence of the yard employees in placing and leav-

ing the caboose in a dangerous position. The defendant, as well as the plaintiff, throughout the trial, dealt with the Mallet type of locomotive, and not especially with engine 701 on which plaintiff was working when injured, and it is shown that all engines of the Mallet type owned by the defendant and testified about were identical with engine 701. A photograph was also introduced in evidence by the defendant of a stoker engine, not on engine 701, but on engine 702 which was shown to be exactly the same, and to sustain its contention introduced evidence to show that engines 700 to 714, both inclusive, were identical in construction, and that all of these engines were so constructed that the fly wheel of the stoker engine would not continue to revolve any length of time after the throttle was cut off. To meet this contention by showing that what the plaintiff said about the running of the stoker engine after its throttle was shut off was true, the witnesses Hutchinson and Taylor were asked, and allowed by the court to answer, the questions objected to by the defendant, and they testified, not only as above stated, but that from actual experience they knew that stoker engines on Mallet locomotives Nos. 700 to 714 were so constructed that they would and did do just what the plaintiff had stated they would after the throttle was cut off.

We are of opinion that the evidence given by these witnesses was material and relevant to the issues made by the defendant and was properly admitted.

The second and third assignments of error may be treated together as the principles involved are identical. The second assignment is that the trial court erred in refusing to direct the jury to return a special verdict ascertaining the ultimate facts upon certain specified litigated issues; and the third is that the court

erred in refusing to direct the jury to "show by their verdict the relative amount of the plaintiff's negligence and the extent by which the plaintiff's damages consequently are diminished." In other words, the request of the defendant was that the court direct the jury to set out in its verdict all the facts which it regarded as proved upon the five interrogatories propounded in the request, namely:

"1st. The negligence, if any, of the defendant, as set forth in the declaration, proximately causing the plaintiff's said injury.

"2d. The amount of damages sustained by the plaintiff by reason of his injury.

"3d. The plaintiff's assumption, if any, of the risk of the injury suffered by him.

"4th. The negligence, if any, of the plaintiff, which contributed to said injury.

"5th. In case the plaintiff was guilty of contributory negligence, then the amount of negligence attributable to the plaintiff and the proportion that said contributory negligence bears to the combined negligence, if any, of himself and the defendant."

This, it may be said, is an unusual request in the practice in the courts of this State and the only reason assigned for it is stated to be that unless this is done the court could not know "whether or not the jury has noticed the set off prescribed by statute, whether or not effect has been given to the statute, or whether or not the jury has obeyed the precise requirements of the statute which alone gives any recovery to the plaintiff."

We do not see that the trial of a case under the Federal employers' liability Act differs at all as to procedure from any other negligence case. The defenses under this act are practically the same as in all other

negligence cases, to-wit, no negligence on the part of
the defendant, contributory negligence on the part of
the plaintiff, and that the plaintiff assumed the risk
of the injury sued for; the sole difference being that
contributory negligence, under the statute, is not a
bar or complete defense, but goes in mitigation or
diminution of damages.    There is nothing about the
fact that contributory negligence goes in mitigation of
damages that calls for a procedure different from the
settled practice in this State.    When Congress gave
the State courts co-ordinate jurisdiction in this class
of cases with the Federal courts, by necessary impli-
cation it adopted the procedure and practice of the
State courts for the trial of such cases.    *C. & O. Ry.
Co.* v. *Carnahan*, 118 Va. 46, 86 S. E. 863.

In *Hall* v. *Ratcliff*, 93 Va. 327, 28 S. E. 1011, the
plaintiff moved the trial court to direct the jury to
answer four interrogatories, which the court did over
the objection of the defendants, and in reviewing and
reversing the judgment entered by the trial court upon
the verdict of the jury, this court in its opinion by
Buchanan, J., said: "A verdict like the one directed
and found is unknown to our practice."

In the case in judgment, the jury was, upon the re-
quest of both the plaintiff and defendant, fully in-
structed upon every question in the case, and particu-
larly upon the provisions of the Federal act, upon which
the suit is based, including its provisions as to contrib-
utory negligence of the plaintiff, the effect of such
contributory negligence, if any, and plainly told that
if they found that the plaintiff was guilty of negli-
gence which contributed to his injury, they must
diminish his recovery in the proportion that his negli-
gence bore to the combined negligence of himself and
that of the defendant; and the jury was also instructed

on the question of assumed risk under said statute. We
do not understand that defendant's counsel questions
that these instructions fairly, accurately and fully
stated to the jury every provision of the Federal
statute applicable to the case, but the contention is
that the court, after fully instructing the jury as to the
law of the case, ought to have made them return a
special verdict setting forth all the facts which they
regarded as proved in order that the court might know
that the jury gave proper consideration to the law
as given to them.

In *Phila. B. & W. R. Co.* v. *Tucker*, 35 App. D. C.
123, which was, as is this, an action under the Federal
act, it was held that it was for the jury to compare the
negligence, if any, of the deceased with the negligence
of the defendant carrier, and to render a verdict for
the plaintiff if they find the negligence of the deceased
slight and that of the defendant gross.

The familiar and well established rule of law appli-
cable to the situation presented in this case is that the
court will presume that the jury gave proper consid-
eration to the law as given in its instructions, unless
the verdict is plainly contrary to the law and the evi-
dence.

If a special verdict were proper in this case, it would
be proper and necessary to have a special verdict in
every negligence case, for the reasoning therefor urged
here, viz., that a general verdict is improper because
the court cannot say without a special verdict whether
or not the jury has followed the instructions given by
the court, would apply with equal force in every such
case; yet such a verdict is, as we have seen, unknown
to our practice, and there is nothing in the language
of the Federal statute that expressly requires such a
proceeding, or from which such a proceeding is neces-

sarily implied.    The question, both as to the existence
or non-existence of contributory negligence, as well
as its proportional relation to the combined negli-
gence of plaintiff and defendant, is, by the statute,
made a question solely for the jury; and in a number of
cases to which we have been cited, brought under the
statute, the courts have without exception, so far as
we have found, refused to direct or set aside verdicts
regardless of the showing as to contributory negli-
gence.    *Chicago & Great Western Ry.* v. *McCormick*,
118 C. C. A. 527, 200 Fed. 375, 47 L. R. A. (M. S.)
18; *Colasurdo* v. *Central Ry. Co.*, 180 Fed. 832, affirmed
113 C. C. A. 379, 192 Fed. 901.    See also note on the
statute 47 L. R. A. (N. S.) 1.

In the recent case of *Kansas City So. Ry. Co.* v. *Leslie*,
238 U. S. 599, 35 Sup. Ct. 844, 59 Ed. 1478, decided June
21, 1915, by the Supreme Court of the United States,
the action being brought under the Federal employers'
liability act, in which recovery was sought by an
administrator to the amount of $10,000 for pain and
suffering endured by his decedent and pecuniary dam-
age to the wife and child of the deceased, the conten-
tion was made by the defense that the verdict of the
jury did not specify the amount awarded, if any, in
respect to the two distinct and independent liabili-
ties, and that the railway company was entitled to a
special verdict, but the opinion of the court in dispos-
ing of this contention says: "It is further objected
that as the declaration sets up two distinct and inde-
pendent liabilities springing from one wrong, but based
upon different principles, the jury should have been
directed to specify in their verdict the amount awarded
in respect to each.    This objection must be over-
ruled.    Of course, in causes arising under this statute

trial courts should point. out applicable principles with painstaking care and diligently exercise their full powers to prevent unjust results; but its language does not expressly require the jury to report what was assessed by them on account of each distinct liability, and in view of the prevailing contrary practice in similar proceedings we cannot say that a provision to that effect is necessarily implied. As the challenged verdict seems in harmony with local practice and has been approved by the court below, the judgment thereon is not open to attack here upon the ground specified."

Apart from the fact that a special verdict, such as was requested in this case, is not in accordance with the settled practice in this State, and is not expressly or by necessary implication required by the Federal statute, we can see no good purpose that could have been served by requiring the jury to set out in their verdict all the facts which it regarded as proved upon the five interrogatories set out in the defendant's request. On the contrary the sole effect of granting this request would, as it seems to us, have been to confuse the jury. Where a general verdict will respond to all the issues of fact submitted to the jury, there is no good reason to be given for requiring of it a special verdict stating the ultimate facts ascertained and the application of the law thereto as made by the jury.

"When all the issues are essentially the same, or such as may be distinctly and fully responded to by a general verdict for either party, there is no principle of law which requires a separate finding as to each." 29 Am. & Eng. Enc. of L. (2nd ed.), p. 1014.

We are of opinion, therefore, that the circuit court did not err in refusing to require the jury in this case

to find a special verdict in accordance with the defendant's request.

The fourth assignment of error is that the court erred in giving plaintiff's instructions Nos. 6 and 8. Instruction No. 6 was as to plaintiff's damages, and the only language in the instruction objected to is as follows: "Proper compensation for his being unable because of his injury to follow such a calling or business as he could otherwise have followed."

The objection urged to this language is that "the plaintiff not being entirely disabled or unable to follow some calling from which earnings would arise, other than that in which he received his injury, he may recover in this respect only for the diminution, if any, of his earning power; and upon the further ground that said instruction in this respect is misleading, and permits the jury to base their verdict upon conjecture or speculation."

In support of this objection defendant relies upon language used by Mr. Justice Lurton, speaking for the court, as to damages recoverable under the Federal act, in the case of *Michigan R. Co.* v. *Vreeland,* 227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. 419, Ann Cas. 1914—C 176, as follows: "We think the act declares two distinct and independent liabilities, resting, of course, upon the common foundation of a wrongful injury, but based upon altogether different principles. . . If he had survived he might have recovered such damages as would have compensated him for his expenses, loss of time, suffering and diminished earning power."

Relying upon this authority, it is argued that "compensation for 'his being unable to follow a calling or business such as he otherwise could have followed,' is an entirely different thing from compensation for 'diminished earning power;' it is not an element of

damages under the statute, as construed by the Federal court of last resort."

We confess our inability to appreciate the force of this contention. On the contrary, the language quoted from the opinion in the case cited, as we read it, clearly not only refutes the contention, but is authority in support of the correctness of the clause in plaintiff's instruction No. 6 objected to. This instruction, including the language therein objected to, is not only based upon ample evidence in the case to warrant the court in giving it, but in similar cases, an instruction using practically the same, if not the exact, language of instruction No. 6 has in a number of cases been expressly approved by this court, among them *N. & W. Ry. Co.* v. *Ampey*, 93 Va. 118, 25 S. E. 226; *Va. & S. W. Ry. Co.* v. *Bailey*, 103 Va. 207, 49 S. E. 33; *C. & O. Ry. Co.* v. *Swartz*, 115 Va. 723, 80 S. E. 568.

Plaintiff's instruction No. 8 to which exception is taken is as follows: "The court instructs the jury that if they believe from the evidence that J. W. Meadows was injured by reason of the fact that a caboose car of the defendant company was placed, moved or allowed to remain by the employees of the said company dangerously near the track over which the said Meadows had to pass on his engine, thereby rendering the track over which Meadows had to pass unreasonably unsafe to the said Meadows in the performance of his duty as fireman, and if they believe that the said Meadows was attending to his accustomed duties, using such care as a man of ordinary prudence would use under the circumstances therein at the time he received the injury, they must find for the plaintiff; unless the jury further believe that the said Meadows' injuries were caused by some risk of his employment assumed by him, as defined in instructions A and B."

The objection to this instruction is that "it directed a verdict for the plaintiff upon a hypothetical case which left out of view evidence tending to prove a state of facts upon which there was no liability upon the defendant—that is, the plaintiff was not in the performance of his duty of looking ahead for signals and obstructions, but was looking to the side when injured, as evidenced by his being struck on the side of his face by the "marker." In other words, while it is conceded that if the plaintiff was struck while in the performance of his duty of looking ahead, the defendant was negligent in permitting the object which struck him to be so close to the track over which his engine had to pass, but if he was not looking ahead at the time, all reason and justification for his having his head out of the cab window disappears and defendant would not be liable for his injury.

The instruction, we think, covered every phase of the defense which the evidence tended to prove, and particularly told the jury that the plaintiff's right to a recovery depended upon their believing from the evidence that he "was attending to his accustomed duties, using such care as a man of ordinary prudence would use under the circumstances therein at the time he received the injury." We find no evidence in the record tending to prove a single fact to show that the plaintiff was not at the time he was struck in the full performance of his duty. He testifies that he was, and his witness, Harding, the only witness who saw the accident, says that he was; so that the only circumstances relied on to controvert this fact is that the plaintiff was struck on the side of his face and not in front, which circumstance we need only to say is without probative force in the light of other facts and circumstances appearing in the evidence. Instruction

No. 8, as we have said, fairly and fully covered every phase of the defense and particularly told the jury that the plaintiff, to recover, must have been in the performance of his duties when injured, using reasonable care, and could not possibly have misled the jury, especially when read along with instructions "A" and "B," given for the defendant, and to which we will presently have occasion to refer.

The remaining assignment of error calls in question the ruling of the trial court refusing to set aside the verdict as contrary to the law and the evidence, and the grounds for this assignment are stated to be as follows: "(1) That the plaintiff assumed the risk of the injury which he received; (2) That the physical facts of the injury show that at the time of the injury the plaintiff was not engaged in performing any duty imposed upon him by his employment; (3) That the verdict of the jury was not certain or responsive to the issues, in that it made no mention of or reference to the contributory negligence of the plaintiff, or finding with reference to the diminution of his damages by reason thereof, in the manner prescribed by the Federal statute."

The second and third of these grounds have already been sufficiently discussed above in disposing of other questions in the case. Upon the first ground stated for its motion to set aside the verdict as contrary to the law and the evidence, the defendant contends that its motion should have been sustained for the reason that the court should have held that as a matter of law upon the record the plaintiff assumed the risk of the injury of which he complained; and much of the evidence relating to the conditions prevailing in the Clifton Forge yards at the time and prior to this accident to plaintiff, and also as to his experience as an

employee of the defendant on its locomotives, running in and out of these yards; but this evidence related only to the question of contributory negligence—that is, whether the plaintiff was, at the time of the accident to him, using such care in looking out from his engine cab as a reasonably prudent fireman, who was familiar with the conditions on the Clifton Forge yards, would use in coming into them. The evidence, as we have seen, is that the plaintiff did not see the object which struck him, and did not know of its location or danger and, of course, could not know that the employees of the defendant were negligent in allowing the caboose to be so close to the lead track, along which his engine had to move, as to strike him. The only evidence relied on by the defendant to show that plaintiff assumed the risk of the injury to him is as to his previous knowledge of conditions in the Clifton Forge yards, and upon this evidence it is argued that he ought to have known that such an accident was likely to happen at any time and that if he had been reasonably prudent and diligent he would not have been struck. It was for the jury to determine from this evidence as to plaintiff's previous knowledge of conditions in the yards, whether the inference was to be drawn therefrom that he knew of the risk, whether it was open and obvious, whether he appreciated the danger incident thereto and voluntarily agreed to assume it. Upon neither authority nor reason can a servant be held to have assumed the risk of a dangerous or unusual condition, brought about by the negligence of the master, or his employees, of which he was ignorant and could not know of by the exercise of ordinary care.

Conceding that the evidence in this case tended to prove facts from which assumption of risk on the part of the plaintiff could be presumed, that question was

for the jury's determination, and it was upon the most favorable construction of the law submitted to them by Instructions "A" and "B," as asked by the defendant, which instructions are as follows:

"(A) The jury are instructed that a person who contracts for the performance of the duties of a railroad fireman assumes such risks as are incident to their discharge from causes open and obvious, the dangerous character of which he had opportunity to ascertain, and if the plaintiff Meadows was injured by a cause, the dangerous character of which was open and obvious, the jury should find for the defendant, although they should believe that the defendant was negligent as charged in the declaration.

"(B) The jury are instructed that if they believe from the evidence that J. W. Meadows knew, or ought to have known, that the view from the front window of his cab on engine 701 was shut off and obstructed by the air pump or other appliances of said engine immediately in front of his window so that in order to perform his duties as fireman it was necessary for him to project his head from the side window in order to keep a lookout, he assumed as a part of his contract of service any extra risks which might be caused by the use of such an engine over that caused by the use of an ordinary engine, which were open and obvious, or by the use of ordinary diligence and observation should have been so to him."

That the court cannot rule as a matter of law that the plaintiff assumed the risk in cases of this nature is held in *Smith* v. *N. & P. Traction Co.,* 109 Va. 453, 63 S. E. 1005, involving facts analogous to and to a large extent identical with the case at bar, where the opinion of the court by Harrison, J., says: "Assuming the circumstances stated in the instruction to be es-

tablished, the law would not presume from them that the plaintiff's intestate knew of the dangerous proximity of the freight car to his own. The fact that the decedent had passed this car before the accident did not charge him with knowledge of its proximity to the track. Whether he knew of such proximity was a question of fact for the jury. He could not be held to know it as a matter of law." Citing *Choctaw, &c. Co.* v. *McDade,* 191 U. S. 64, 24 Sup. Ct. 24, 11 L. Ed. 96; *Texas & Pacific R. Co.* v. *Swearingen,* 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382.

"In the cases cited the structures which constitute the danger were permanent. The case at bar is stronger, in that the structure was temporary. To charge the servant with notice the defect and danger must be unquestionably plain and clear, so that if he did not see it, he must necessarily have been in fault." Citing *N. & W. Ry. Co.* v. *Cheatwood,* 105 Va. 365, 49 S. E. 489.

See also the recent case of *McGovern* v. *Philadelphia, &c. Co.,* (U. S. Adv. Op. p. 127), 235 M. S. 398, 35 Sup. Ct. 127, 9 L. Ed. 283, and *Seaboard, &c. Ry. Co.* v. *Moore,* 228 U. S. 433, 33 Sup. Ct. 80, 57 L. Ed. 909; *Gulf, &c. Ry. Co.* v. *McGinnis,* 228 U. S. 173, 33 Sup. Ct. 426, 57 L. Ed. 785, which two cases last named are cited and followed in *Southern Ry. Co.* v. *Jacobs,* 116 Va. 189, 81 S. E. 99.

As observed, all the evidence relied upon in this case to show plaintiff's assumption of risk goes only to the question of contributory negligence; and under the Federal act upon which the action is founded, it is necessary to distinguish between contributory negligence and assumed risk, since assumed risk is a complete defense under the statute, while by the terms of the statute contributory negligence is not a bar

but goes by way of diminution of damages. The distinction is clearly drawn in the case of *Davis Coal Co.* v. *Polland*, 158 Ind. 607, 62 N. E. 492, 92 Am. St. Rep. 319, where it is said: "Assumption of risk is a matter of contract. Contributory negligence is a matter of conduct. If a servant would be defeated of a right of recovery for an injury, by the rule of assumed risk, it would be because he agreed, long before the accident happened, that he would assume the very risk from which the injury arose. If he were to be defeated by the rule of contributory negligence, it would be because his conduct at the time of the accident and under all the attendant circumstances, fell short of ordinary care. If the one circumstance of the employee's knowledge of the employer's failure to provide the statutory safeguards were held, as a matter of law, always to overcome the other circumstances characterizing the employee's conduct at the time of the accident, assumption of risk would be masquerading in the guise of contributory negligence."

In *Southern Ry. Co.* v. *Jacobs*, *supra*, this court said: "Assumption of risk is a doctrine wholly distinguishable from that of contributory negligence, which is a breach of legal duty imposed by law upon the servant, however unwilling or protesting he may be, while assumption of risk is not a duty, but is voluntary on the part of the servant."

To apply, therefore, the doctrine of assumed risk to this case, it must appear, either directly or by necessary implication, that prior to the accident to plaintiff he impliedly agreed with the defendant that he would not hold it responsible for any injury that might occur to him resulting from the negligent protrusion of cars too near the track in the Clifton Forge yard, over

which he had to pass in the discharge of his duties as fireman; and that too in face of the fact that the uncontradicted evidence is that he did not know and could not have known by the exercise of ordinary care of the location of the caboose that struck him.  The evidence affords no ground upon which the existence of an implied contract on the part of the plaintiff not to hold the defendant liable for its default and negligence in placing the caboose so close to the track over which he had to pass as to make it necessarily and inevitably dangerous to him in the performance of his duty, can be predicated.  He could not have known of the position of this caboose before he arrived at the yard for the reason that it had just been placed in dangerous proximity to the "lead" track, and its position was not fixed and he did not see it when he was coming into the yard nor at any time.  If he could have been charged with notice that sometimes the employees in the yard were careless and negligent in leaving cars too close to, and fouling the "lead" track, this would have called for the exercise of a higher degree of care on his part, but would not have warranted the jury in finding that because he knew the yard men were sometimes negligent he assumed the risk of their negligence in leaving the caboose in question where it was left.

In the case of *Yazoo & Miss. Val. Ry. Co.* v. *Wright*, decided by the Supreme Court of the United States December 14, 1914, 235 U. S. p. 576, 35 Sup. Ct. 130, 59 L. Ed. 277, the action was, as is this, under the Federal statute, and the accident out of which the suit arose occurred to an engineer while entering the railroad yard, and was caused by the fouling of the "lead" track by cars placed too close to it.  There, as in this case, it was contended

that the injured party, under the facts and circum-stances shown in the record, was to be held as having assumed the risk of the negligence of the defendant's employees causing the injury to him, but the court held to the contrary, the opinion by Chief Justice White saying: "Whatever may be the difficulty of distinguishing in many cases between the application of the doctrine of assumption of risk and the principles of contributory negligence, that there is no such difficulty here is apparent, since the facts as stated absolutely preclude all inference that the engineer knew, or, from the facts shown, must be presumed to have known, that the coal cars were protruding over the track on which he was moving, and deliberately elected to assume the risk of collision and great danger which would be the inevitable result of his continuing the forward movement of his train.

"The impossibility of deducing assumption of the risk from the facts stated is cogently demonstrated by the arguments advanced to establish that the risk was assumed. Thus it is urged that, as in a railroad yard, there was danger to arise from the protrusion of cars negligently placed by employees of the company, a danger which the engineer must have known might arise, therefore he has assumed the risk of such danger. And, again, the argument is that even though the engineer did not know of the protruding cars, and therefore did not consciously incur the great risk to result from the collision, yet as by proper precaution he could have discovered the fact that the cars were protruding, he must be considered to have assumed the risk which resulted from his want of care. But both these arguments have no relation to the doctrine of assumption of the risk, and only call for the application of the principle of contributory negligence or of fellow servant."

The true rule of law deducible from the authorities is, that the servant assumes all the ordinary, usual and normal risks of the business after the master has used reasonable care for his protection, and also all such other risks as he knows of, or which were so unquestionably plain and clear that he must have known of their existence and their danger to him.   In addition to the authorities in point cited above, see the following: *Texas & Pac. Ry. Co.* v. *Archibold*, 170 U. S. 665, 18 Sup. Ct. 777, 42 L. Ed. 1188; *Gila Valley Ry. Co.* v. *Hall*, 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521; *Black* v. *Va. Portland Cement Co.*, 104 Va. 450, 51 S. E. 831; *Norton Coal Co.* v. *Murphy*, 108 Va. 528, 62 S. E. 268; *Darby C. Min. Co.* v. *Shoop*, 116 Va. 848, 83 S. E. 412; Labatt M. & S., Vol. 3, sec. 1189, pp. 3204 *et seq.*

In this case the plaintiff not only was ignorant of any danger to him in entering upon the defendant's yard at Clifton Forge, but he was given assurance by a positive fixed signal that the entire track over which he had to pass to his destination was clear and safe, so that there was no danger to him in the performance of his duties as fireman on his way through the yard.

Upon the whole case we are of opinion that the judgment of the circuit court is without error and should be affirmed.

*Affirmed.*